This case has a lot of issues. It would be helpful to know in advance which ones you principally intend to address. I'm going to address the TILA issue briefly, as well as RESPA, racial discrimination, and the refusal to provide legal medicine. I.A., everything. Okay. I will try and focus on some issues within those, Your Honor. And we think the core issue here is that this is an appeal about the no displeasing standard. If I got this right, incidentally, factually, these people made, I think, less than $100,000 a year. They got loans which, between the two of them, enabled them to get a $750,000 house without any very substantial down payment on it. They've lived in it for several years without making mortgage payments, and they have not been evicted, and they're suing the lender. Is that right? No, Your Honor. That's incorrect. Okay. Educate me. Sure. At the time they sought the loan, their assets were approximately $13,000 per month. They had credit scores of 690. You mean their income? Their income was approximately $13,000 per month. Their credit scores were 692 and 670, which would entitle them to a prime loan. They had conventional offers. Their income was $13,000 a month. How much can you borrow if you make $13,000 a month? It depends, Your Honor, on the amount of a down payment you're willing to make. In this case ---- Let me explain. There is no house in my town that costs as much as $750,000. I don't think there's one. And a lot of people make $13,000 a month. So I'm kind of thrown off here right at the beginning. Sure, Your Honor. This is in an expensive area. These plaintiffs had assets. They had conventional offers from other lenders. And in particular, what this case is about is a bait-and-switch scheme. So even if the plaintiffs could not qualify for the loan they were offered, they were baited by Countrywide into coming into the door, being offered a subprime loan, Countrywide being offered a prime loan, Countrywide delivered a subprime loan, and refused to provide them any documents bearing on the terms of their loan. What is the harm to them? It sounds like they got to borrow all this money, they get to live in the house, and they don't pay the money back. No, Your Honor. That's incorrect. First of all, the plaintiffs paid $200,000 in interest-only payments directly to Countrywide. Oh, they did. Yes.  That's what I needed the education on. Sure, Your Honor. They did make $200,000 in payments. Yeah. They alleged. So what they're doing now is paying too much interest because of the structure of the loans? Exorbitant interest, Your Honor. They were promised a prime loan, delivered a loan, which 80 percent was an adjustable rate. Of course, the terms were not disclosed to them. And 20 percent was a home equity line of credit, terms also not disclosed, at about 10 percent interest rate. So exorbitant terms, and when they- Hold on. It's hard for me to grasp the entire case in one sentence. What I want to know is they paid $200,000 back, and more of it is interest and less of it is equity than it ought to be because they were tricked into getting a home on excessively bad terms. That is correct, Your Honor. Is that right? That is absolutely correct. And the district court here ignored Justice Thomas's controlling decision in Squerkiewicz that Roulette creates a simplified notice-pleading standard, and also the Supreme Court's decision in Erickson that pro se complaints must be construed liberally. It also refused to provide leave to amend in circumstances where even parties with counsel would have been entitled. In regards to plaintiffs' TILA claims, their claim for rescission, the district court held that they were required to tender when seeking rescission. It did this sua sponte in its decision dismissing the case without leave to amend. Countrywide did not brief this issue. On the Truth in Lending Act, what they want is rescission, right? Their claims for both rescission and for damages. They get out of the loan, and they no longer have to pay back on those terms, and they pay back the money that was given. So Yamamoto says that a tender can be required. Did they ever show they were in a position to make this Yamamoto tender? Two points of clarification, Your Honor. First, they're seeking to rescind the home equity line of credit, not the entire loan, and they would be entitled to a return of the interest fees that they were charged on that. Second, as I mentioned, Yamamoto was a summary judgment decision. The consumers were given 60 days after summary judgment to tender. It arose in the context of a deposition where the consumers had admitted they couldn't tender. In this case, this issue was not even briefed before the district court. The plaintiffs were never given the opportunity to tender. They could tender if required to do so on remand. But as the Tenth Circuit's recent decision in Sanders indicates, tender is not an element of a claim for teal or rescission, and to require it at the pleading stage exceeds the court's equitable power under Yamamoto. Now, exactly what do they want in terms of the rescission? What do they want to give back, and what do they want to keep, and what do they want their adversaries to rescind? Sure, Your Honor. In terms of the rescission, they would give back the rescindable portion of the home equity line of credit. It's approximately $26,000. In return, it would be offset by all the interest. They want to give back $26,000, and what is the $26,000? That is the rescindable portion of the line of credit. Rescindable portion is conclusory. I – before deciding whether it's rescindable, I want to know what it is. Sure. Let me explain. That is the portion of the line of credit that was not used to purchase the home. And in return for getting that back, the lender would be required to remove the security interest on the home. There could be an equitable reformation of the deed to reflect the rescission of the home equity line of credit. Why – I'm not sure this is relevant to anything, but why would that help them? I gather that there's still the mortgage out there. That would help them, Your Honor, because obviously the lender would no longer have a security interest in that portion. That second security interest, but there's still a mortgage. There is still a mortgage, and the bank – It also is in Marreras? The mortgage is in – is in Marreras. They stopped paying when filing suit. Their hope is through the litigation they'd be entitled to damages, and they'd reach a resolution that would allow them to continue making payments or to – or to sell the home and seek another loan. But this issue, the rescission issue, only goes to the home equity loan because TLA only covers the home equity loan. Because that is correct, Your Honor. Explain that – explain that to me a bit. Yeah. The home equity loan, the $26,000 part of it, the rescission only goes to that. So – so you're saying that the balance of the home equity loan and the home equity loan was $147,000, right? Yes, Your Honor. I think the Court can look at it two ways. The home equity line of credit, the portion of it that was used to purchase the home is not rescindable. One way you could look at it is in the district court, Countrywide argued that the plaintiffs could rescind the entirety of the home equity line of credit. That's the representation they made to the district court. Second, you could look at it on the terms of the home equity line of credit itself, which says if you repay some of this, use it for other purposes, as they did for regular transactions, then that aspect of it is subject to rescission. That's approximately $26,000. So you want the home equity loan lender to walk away from all the money that was given to the seller of the home and walk away from its second mortgage on the home. That is the requirement under PUA, whereas here no information was disclosed about the terms of the loan. Your rescission – hold on, I'm trying to find out what you want so I can separate it from what the arguments for it are. Sure. And what I'm understanding that you want is basically they get to keep the house that was purchased with the money and they don't have to pay the money back. They just pay a portion of the interest back and then they can walk away from the rest of the loan and keep the house. Is that right? They would rescind the non-purchase portion of the home equity line of credit. The lender's security interest in the property would be reduced by the amount that was rescinded. So this company – this was Countrywide? Yes. Countrywide wrote a check to, I would imagine, the escrowee or the bank or the seller for $147,000? Yes. And that made it possible to buy the house? Yes. Countrywide would not get its $147,000 back. It would get $26,000 back. If the entire home equity line of credit was rescindable, it would get $147,000. But it's not. So you're not suggesting that the security interest is going to disappear. You're just suggesting that it's going to decrease by $26,000. That's correct, Your Honor. And if I could just – I thought you said the security interest would disappear, that Countrywide would have to give up its lien. In the amount that was rescindable. I.e., $26,000. Yes. But not the rest of it. Just reduce its lien by 26. Moving on to the RESPA claims here, the district court held that RESPA did not allow for equitable tolling. That is inconsistent with recent U.S. Supreme Court precedent, the Seventh Circuit's decision in lawyers' title. Do we have to reach that question, or is there a – as I understand it, there was – there was some of the facts here that relate to a period that would be beyond the – or some of the claims relate to a period beyond the statute of limitations, but others don't. Is that right? Your Honor, the RESPA claims require tolling of the statute of limitations. Why is that? Because they are beyond one year for the Section 8 claims. The Section 6 claims do not require tolling because that's a three-year statute of limitations. Okay. So what's the Section 8 claim? The Section 8 claim is for an inflated appraisal, and we must bear in mind this is a multi-defendant case. Defendant Benson – I see. But if we thought that was otherwise not a viable claim, then it wouldn't matter. No, Your Honor. The Court would have discretion to reach that issue, but of course, it was not in the law. And that issue is this issue that's been – and it's fairly complicated, but it's – there are pieces of it in various circuit opinions, but we don't. Do we have – does the Ninth Circuit have an opinion on the Section 8a, 8b problem and whether an inflated cost as opposed to a kickback is covered? No, Your Honor. And this isn't an inflated cost. What is at issue here is an inflated appraisal. So what plaintiffs allege is that the appraiser gave a thing of value, an inflated appraisal, in exchange for the referral of business. That appraiser did not move to dismiss below. He answered instead. The district court gave him the benefit of its ruling that the rest of the statute of limitations was a statute of repose. But plaintiffs' claims are certainly plausible because the appraiser didn't rely on any of the other townhomes in their complex, same square feet, exact same layout, and instead inflated this appraisal by over $60,000. I have trouble with two aspects of that. One is I don't see how an inflated appraisal hurts the homebuyer. I can see where it hurts the lender because the lender makes a less secure loan, but I can't see why it hurts the homebuyer. My second problem is I don't see why that should be treated as a kickback. The kickbacks that were addressed by the statute were pretty conventional kickbacks. People involved in the transaction, whether realtors or lawyers or whatnot, might be induced to steer business to a particular lender, and for every homebuyer that they steered to the lender, they might get a few hundred bucks. That was the way the kickbacks worked and that the statute outlawed. No, Your Honor. HUD's definition, 24 CFR 3500.14, says defines things of value extremely broadly, and here the inflated appraisal was at the core of the countrywide business. So if you give somebody a vacation in the Bahamas instead of a few hundred bucks, it's also a kickback. And if you give them a discount on something else, it's also a kickback. Here, I don't understand why an inflated appraisal is a thing of value. It seems like it's a thing of negative value. It's actually much more of value because it allows countrywide to securitize the loan at higher, to make higher profit. It allows the broker to make higher commissions. Essentially, this is something that this the problem of inflated appraisals was somewhat at the core of the whole real estate collapse problem, because the – I mean, strangely, at that point, the lenders wanted to give more people more money than they were entitled to and then securitize. That seemed to be what was going on. That is correct, Your Honor. There, the people who lost the money were the lenders and the people who invested in securities of the lenders and the people who invested derivatives based on the securities of the lenders. The homebuyers didn't suffer from it. They did that to pay much higher payments in this case. And the Spears case – Just because they borrowed more money. Because they borrowed more money at onerous terms that weren't – But they got the money. But don't they end up underwater in the whole transaction? Isn't that really the – one of the core problems? They owe now $700 and however many thousand dollars on a house that's worth a lot less than that. That isn't the problem, Your Honor. The problem is that they allege that they could have gotten a better loan and were steered into a subprime loan. They had other offers. They were steered into that. But what does the inflated appraisal have to do with that? I was answering His Honor's question. But they're related. I mean, you do have to explain why it was beneficial to the lender as part of the scheme to have an inflated appraisal. To the lender, but also we have Defendant Benson, who's the appraiser and the seller. It's obviously beneficial to the seller, Defendant Chen. He made the initial referral to Defendant Benson in exchange for Benson's agreement to inflate the appraisal. He gets a higher selling price. He speaks with Countrywide about it. Their broker gets a higher commission. And Countrywide gets the same. There's also a factual dispute, and I'm sure we'll be hearing about it, as to whether – who really paid the appraiser and whether – and so on, which is a different problem, as I understand it.  I think it's important to note that the plaintiff's claim is not the same as the  The plaintiff's claim is that the appraisal was made by Countrywide under the statute. Just briefly on the racial discrimination claim, we think that the plaintiffs here pled enough for a pro se civil rights racial discrimination claim. The case is that Countrywide's sites are all in the context of summary judgment decisions, and they are inconsistent with the Supreme Court's precedent in Swerkowitz, this Court's decision in Edwards and Meduca, and the Second and Seventh Circuit's decisions in Boykin and Keycorp. Countrywide argues that the Can I go back to Section 8 for a minute? Sure. I gather there actually is a markup issue in this case, too, no? Yes. And that's the issue I was referring to earlier when you said there wasn't one. And that issue, is there a Ninth Circuit? There are opinions in many other circuits, as I understand it. Is there one in the Ninth Circuit? Well, there's a recent Supreme Court decision which indicates that divided fees and fee splitting is actionable under RESPA. And here what the plaintiffs allege is that Countrywide charged the plaintiffs for services provided by third-party affiliates, LandSafe, other Countrywide titled companies, and marked that price up, split the fees. Right. But that doesn't deal with the markup problem. I mean, this question of whether a company who is simply charging a marked-up fee as to which that's going in their pocket, not in somebody else's pocket, on somebody else's work, is covered by Section 8. Now, there is no Ninth Circuit or Supreme Court case on that, but there are in other circuits. Just quickly, is that right? Your Honor, the Freeman case says if one party, and that's a recent Supreme Court case, it says if one party has a charge that that is not actionable, but it says if there are affiliates of the lender and the fees are divided between them, such as when, you know, Countrywide charges $30 for a credit report. But as I understand it here, the claim isn't that the third party is getting more money than they're entitled to. It's that the person they're directly dealing with is getting more money than they're entitled to. That is correct. Or not even entitled to. I mean, more money than they can justify by work done. They're just — I mean, as many — as often happens, they're making a profit on their supplier, essentially. Exactly. Countrywide Home Loans is making a profit on Countrywide Tax Service and Countrywide Credit Service. And Freeman doesn't address that question. Freeman indicates that in DICTA that when you have divided fees between two entities like that, that that is actionable. What Freeman held was that when you don't have two entities involved, you can't Well, you have divided fees, but the question is whether the divided part of the — the part of the fee that's going to somebody else is marked up. But if the part of the fee that you're keeping is marked up, that seems like a different story. Your Honor, the part that is — well, I think there's two issues. Here, there's fees that Countrywide is keeping, Countrywide Home Loans, and sending to other affiliates. Second, there's an issue where the HUD-1 that the plaintiffs didn't receive until 2009 shows Countrywide Home Loans providing credit services when, in fact, those are provided by a third-party affiliate of Countrywide, Countrywide Credit Service. So you have it going the other way there. So you have it in both directions, where Countrywide Home Loans is keeping a fee that was for a service provided by an affiliate, and where Countrywide is sending a fee to an affiliate where it claims that it did the service itself. Okay. Thank you very much. This is, as we can tell, a very complicated case. Go ahead. Yes. Thank you. I found the complaint very hard to read. And, of course, you'd expect that of a pro se complaint. Since the plaintiffs have counsel now, I was wondering, when did counsel come into the case, and why isn't there, I believe it would be a third amended complaint drafted by counsel so that it will be clearer and easier to read? Your Honor, I was appointed by this Court as part of its pro bono project. There was no counsel in the district court. These are pro se plaintiffs, and I would also note that both in Swanson and in Williams, those circuit courts discussed pleadings that were, quote, far from a model of clarity, quote, contradictory or impossible. I understand you already answered my question. I don't need the argument. I just needed the factual answer. And I think to the extent that this Court is unsatisfied with any of the allegations in the complaint, it has a way out, which is to remand the case, forweave to amend, assisted by able counsel. I think the closeness of the substantive questions on this appeal, and to the extent that the Court's unsatisfied with the inartfulness of the complaint, provide ample reason why these plaintiffs should get a shot with counsel. I do think, though, that the allegations are sufficient for pro se plaintiffs under Swerkowitz and the cases following it. And Countrywide does not cite any published appellate court case where an appellate court has found that pro se plaintiffs pleading a discrimination claim failed to plead sufficient facts. You answered my question a long time ago. Thank you, Your Honor. Thank you for a helpful argument, and thank you for participating in our pro bono program. Sir. May it please the Court. I was intending, actually, to address the issues in the reverse order and start with the discrimination claim. I mean, to be frank, I mean, it would be most the discrimination claim is something we can understand more easily. We understand that there's a question about whether the pleading is sufficient, but that's a pleading question. The rest is somewhat arcane and not as familiar to us. And if I were advising you, I'd suggest that you do it the other way. Okay. I'll start, excuse me, by addressing the RESPA claim. And as I think the Court suggested, the Court doesn't need to decide whether equitable tolling is available under RESPA because it would not save the claims. Under, excuse me, King v. California, equitable tolling only applies until the borrower had a reasonable opportunity to discover the fraud or nondisclosures. With respect to the Section 8a claims, which is the splitting or markup, that really focuses, excuse me, that's really the appraisal claim. The merits could have gone to the recorder's office even before they got their loan to see what their neighbors and their seller had paid for their condos. That sort of constructive notice is sufficient to preclude tolling under the King v. California rule. You can tell in California what your neighbors paid for their condos? You certainly can. You can go down and look at the grant deed. And that's been included in the record. I always used to write them $1 plus other valuable consideration. Well, in California, you can also go to the tax assessor's office and see what it's assessed at, which is generally based upon the recorded deed. Our tax assessments are usually much lower. Do your deeds in California say what the actual payment was? They don't say $1 and other good and valuable consideration? No, Your Honor. I don't believe they do. We have in the record also the tax assessor records. But their claim here, as I understand it, is that they were supposed to get notice at the time of closing, no direct notice, and they didn't. And so until they did get the notice, which was long later, they didn't actually know what the cost was. Is that the basic claim? Well, first of all, we're starting with Section 8A. So why don't I deal with Section 8A? A violation of Section 8A requires an agreement to refer business. And in this case, it's alleged that the seller, actually, referred the appraisal to Mr. Benson, the appraiser. But that's confirmed in the reply in Mr. Merritt's State Court declaration. What's really significant, with respect to the defendants other than Mr. Benson, is that the declaration of Mr. Merritt states that that referral was made days before the Merritts' ever first contact to Countrywide. So this logically refutes any claim that Countrywide referred Benson. Why? Excuse me. The why? Because the allegation is we went to Benson before March 6th. March 6th, Mr. Benson, the plaintiff said. Oh, so we went to Benson. The plaintiff said, the plaintiff's broker went to and asked Mr. Benson to perform an appraisal. Before Countrywide. Before the plaintiff's ever contacted Countrywide. The broker, if you look at his appraisal, says this is effective March 6th, 2006, because that's when I walked through the house. The Merritts alleged that they didn't meet Countrywide and weren't referred to Countrywide by Wells Fargo to after that date. It could be that he, that Mr. Foster was essentially conceding that but saying, but we're still suing Mr. Benson. Perhaps. The other thing I would note, though, very briefly is this is not a case where you  The Merritts agreed on February 24th, 2006, to buy the home for $739,000. There's no allegation that they were cheated by the seller, that there was any defect in the house, and there's no allegation that there was a collusion between the seller I thought there was. I thought the claim was that the seller was representing himself to be the agent, but he, or to be, I don't know if he was representing himself to be the loan person or the agent, but he was really the seller. Well, he, I'm not sure that's the allegation, but in fact, if you look at the purchase agreement that the Merritts signed, that's part of the agreement, it lists Johnny Chen as the seller, and he was the guy who was also holding himself out to be the agent. So he's acting in a dual role, and that's perfectly legitimate, and that doesn't mean that the sale doesn't establish the fair market value because there's no allegation that there was anything defective about the house. And my point is that this is a case where the appraiser is not influencing what they've agreed to pay, 7 and 39, before they ever go to the appraiser to get the appraisal. So one, under Section 8A, there's no referral. Yes, but my understanding is that the claim is that by having, and I understand there are these other problems with the appraiser, and obviously we have to figure them out, but the claim is that by getting the, it's not unheard of that people overpay for houses. So my understanding is that the claim is that by getting this inflated appraiser, one, they confirmed their sale price, but two, they ended up getting a loan for more than they would have got a loan. In other words, had there not been an inflated appraisal, Countrywide would have said to them, we're not going to give you a loan of that amount, they would have had a lesser loan, and perhaps they wouldn't have even bought the house. Well, I suppose it's all conceivable, but it's implausible that the appraisal is inflated given that there's a fair market value established by the purchase. This is not a case of a refinance. You have inflated appraisals perhaps and refinances, but it's nothing. Don't people fairly routinely enter into contracts to buy houses, then go to an appraiser and get an appraisal for less? I can tell you that they do, because I've had it happen. And then they may go get another appraisal because they still want to buy the house for the $739,000, and they've committed to it. But nowadays, the lenders say, we're not giving you a loan for that house because it's not worth what you've agreed to pay for it. Actually, the way it used to work back in the healthy days, you'd agree to buy the house, the bank would hire an appraiser notorious for lowball appraisals, and the bank would tell you, unless you want to back out of this deal and lose your earnest money, you're going to have to come up with a bigger down payment, so the bank would be better secured. That's the old way. Then moving on to the Section 8B claim, which is the markup, the reply doesn't dispute that Countrywide didn't charge the plaintiffs for insurance or copying, which is what's alleged in the complaint. Instead, the reply pivots and points to an $80 tax service fee and a $26 flood service fees. But these fees weren't pleaded or argued to the district court. They just pop up on the reply. Moreover, Section 8B of RESPA only prohibits the lender from marking up a fee from a third-person service provider if the lender does nothing in conjunction with that service, and the reply offers no showing of that occurring. So we don't have the substantive elements of either 8A or 8B violation. But what are doing the merits here? I mean, I thought this was an equitable tolling trial. And this gets to tolling. Wasn't it dismissed because of the violation of the statute of limitations? Yes. And that was the correct decision, because the equitable tolling, we don't have to reach the issue of whether equitable tolling applies to a Section 8A claim. It's simply not available here under the facts that have been pleaded and under King v. California, which says equitable tolling only applies until the borrower has had a reasonable opportunity to discover the fraud or the nondisclosures. And recent cases have held in the district court. Okay. The Section 8A claim has to do with the appraisal. The merits could have gone to the recorder's office or even before they got their loan. Okay. That's the one you laid out there. Right. And the recent case of Gonzales v. SunTrust Mortgage out of the Eastern District of Washington confirms that that sort of constructive notice is sufficient to preclude equitable tolling under King v. California. With respect to Section 8B, when the plaintiffs allegedly discovered on March 28th, 2006, that their agent, the title company handling the closing, had given them loan documents that allegedly had blanks in them, in the exercise of reasonable diligence, they should have gone back to their agent, the title company, to get the documents. And their failure to do so at that time was the reason for their failure to do so. They claim that my understanding is they contend and seem to back up that they wrote many letters attempting to do that. They wrote to Countrywide, they allege, but they don't say they ever went back to their agent, the title company, to get complete documents. That was their agent. They could have easily done that. Not doing so is a failure to exercise due diligence. Don't the cases say that there's no magic to all of this, that the point is if you ask, if you ask for these documents, if you ask everybody you can think of for the documents and they don't give them to you, then you've done what you're supposed to have done. It seems like your point is very technical, that they didn't write to the right person, so they don't they're not entitled to these real documents that they got in blank form at the closing. Well, I would stand by my position that they had an agent, and it was their agent's responsibility to give them those documents. The bank is not the closing. So what happened on the documents? Did somebody make a mistake? Did they not exist at the time? Had the blanks never been filled in? What? Your Honor, frankly, the bank believes that it delivered completed blank documents, and we don't accept the allegations as true that the documents were blank. I see. And that would be a serious mistake. Can we get to the TILA claim? Yes. I will address the TILA. I mean, is it true that there's not that all that's at stake in the TILA claim is $26,000, basically, or the security of $26,000? Well, first of all, we don't ever get to rescission because it's not applicable. The issue here is the papers in three days, then they can sue for rescission. Right. But first, any residential mortgage transaction, which is essentially a purchase money mortgage, is exempt from TILA rescission. You didn't argue that in the district court, did you? No. No, you didn't. Unfortunately, we're entitled to make it now, Your Honor. I understand their claim to be that that's true, but they then repaid some of it, and so there was misplaced concession below, but that doesn't create an estoppel because the district judge did not rule on that basis, so there was no invited error, and it doesn't change the law, and it doesn't change the facts. The plaintiffs admit that at the time they got their loans on March 27, 2006, they used all the funds that were available under the HELOC, just like all the funds used at that time. I understand their claim to be that that's true, but they then repaid some of it, and so there was money left. I don't quite know how it worked, but their essential claim is that there was $26,000 that in the long run was not attached to the sale of the house because they had already repaid the money, and therefore, what they had left they could use for something else. I don't believe that's the law, Your Honor. I don't believe that there is any – the issue of whether they have to get a notice of right to cancel, for example, depends upon what the use of the funds are at the closing, and the fact is at closing, they used all the funds for purchase. So it was – – that if a home equity loan is part of a hybrid mortgage package, right, whether it's 50% of the loan or 20% of the loan, whatever, one part is a traditional 30-year fixed mortgage, the other part is a HELOC, right? Yes. And you say if it's all done as part of the closing on the house, then it's all exempt from rescission, even if $25,000 or $50,000 of that is really home equity loan that's going to be used for improvements on the house, right? Yes. Now, my question for you is what case stands for that proposition? Well, I think that's what the regulation says. So is your answer no case? I haven't seen a case ruling on this issue. All right. Now, my second question is why is this done and appropriate for a motion to dismiss? Why shouldn't this be done in a motion for summary judgment? I mean, shouldn't there be a record as to whether it's really $26,000 or any part of it or if the whole thing was part of the purchase of the house? Because the documents, the we know that the house was purchased for $739,000 and the plaintiffs alleged that and they alleged they got two loans for 100% of the purchase price and they used 100% of the loans to purchase the house on that day. So it's alleged in the complaint. There's no question of fact. And it's irrelevant what happens later. It's irrelevant if they pay back $25,000 later. That doesn't mean that at the day they close it's not a personal mortgage. You'll go to the next stage assuming that we didn't rule on that grant. What's next? But even if rescission were available, the plaintiffs failed to comply with Section 1635a, which requires that the borrower make a written demand for a rescission within three days of, quote, delivery of the information, close quote. That's what the statute says. They have to know they have that right to rescind, and isn't that the point? They didn't get the papers that said they have the right to rescind? Well, I'm not saying they should have done it then, but I'm saying they say, finally, we got the papers on January 20, 2009. That's when their three days started ticking. And the documents tell them that. And they admit that they didn't request rescission until eight days later in their state court complaint. So you have a three day window to do it whenever you get full and complete disclosure. And they allege they got that on January 20, 2009 when the bank finally delivered it. And Section 1635 does not extend the three day period to send a letter demanding rescission. It simply provides a statute of repose of three years for filing based on a violation of 1635a, and that's the McCombie-Gray case out of this circuit this year. And what – this is all very complicated. Are you saying that after January 20, 2009, they wrote a letter saying now we want rescission? No, Your Honor, I'm saying actually on January 20, 2009, they finally got their loan documents. I understand that. And they waited until January 28, eight days. And the statute says – Something about writing a letter in the meantime. Right. You have three days from delivery of the information to write a letter to preserve your right to rescind. And they didn't do that. That's the language of 1635a. So you have to act promptly to rescind once you get the disclosures. And they allege that they got them on January 20, 2009, but they didn't act timely. And that's a hard line rule in the statute. The three years is simply the time for bringing a claim. Maybe in the court. A claim of what? A claim of I tried to rescind, but they didn't let me? Exactly. Exactly. That would be a damages claim rather than a rescission claim, right? Yes, that's correct. So I do want to address what ordinarily would mean if everything was done right. You come home from the closing and you say, oh, my gosh, what have we done? And you go back and you say, we're backing out. Yes. And that's what they had the opportunity to do. Get their money back and their house back. Exactly. It's a complete unwinding. And that's what they had the opportunity to do when they received their materials. Are you defending that the district court didn't go off on any of this? The district court, just a minute, went off on this Yamamoto notion that they had to allege ability to proffer, and are you defending that decision? Well, I do believe that it's consistent with Yamamoto to require that the plaintiffs allege that now that they're in court, they're ready, willing and able to tender the amount. I thought Yamamoto required a case-by-case analysis. And I, again, don't understand how you can do a case-by-case analysis on a motion to dismiss stage. Don't you need to develop a record before you can do an analysis like that? Well, yes. But if you don't step into court to say you're ready, willing and able to tender, then you don't get past the threshold. Then once you allege that, that can be tested in a deposition and summary judgment, is my point. So they fail to meet that prerequisite of saying we are now ready, willing and able to tender in the complaint. You wanted to begin with the discrimination claim, and I suggested that you not. But I do have a question about it, which is not a substantive question about this case. But is there some nationwide class action against Countrywide with regard to essentially similar allegations? Yes, there are. This one's not a class action. But this person would be a member of the classes or we don't know that? I don't know the time period, but I imagine they would be. There are many pending class actions and investigations. Okay. All right. Thank you. Is there anything else you were dying to say? Well, I did want to address. Because your opponent did go over a bit more than that. I did want to address why I believe there should be no leave to amend with respect to the discrimination claims. I had just six points there. All right. That's a hard argument. May I address it briefly? You can tell me six. You can list them. Okay. The complaint admits that the defendants targeted all Americans with subprime loans out of a profit motive, not out of racial animus. It alleges the defendants' primary purpose and goal was to sell as many subprime loans to the secondary market as possible, and that they pursued that goal by marking these loans not just to minorities, but also to the white majority. The appeal does not dispute that the plaintiff's HELOC was frozen pursuant to its terms because the property had dropped in value by more than 5 percent. Four, the complaint alleges that Countrywide favored plaintiffs by qualifying them and that two other lenders rejected them before they ever got to Countrywide. Fifth, the maximum amount of an FHA loan in 2006 for a single-family dwelling, even in this high-priced area, was $362,790. So plaintiffs couldn't possibly finance the purchase of their house with an FHA loan. Six. Is that in the complaint? No. I mean, this is going back to Judge Smith's theme. I mean, we're on a motion to dismiss right now. Right. But there's a recent case in the Ninth Circuit where the Ninth Circuit took judicial notice on appeal for the first time of just precisely this type of information listed and made publicly available by government entities, and that's the Daniels Hall v. National Education Association. So that's a public record. You can look on the HUD website, and it shows that was the limit. So the idea that he was denied a loan for an FHA loan for 95 percent of the value of that home, it's not just plausible. It's not possible. It's not related to racial discrimination. It's related to HUD's limits. And six, Mr. Merritt's admission that the condo's seller directed him to Countrywide negates the bald assertion that Wells Fargo conspired with Countrywide and the other defendants to refer plaintiffs to Countrywide for a loan. So the district courts. Thank you very much. Thank you. Just briefly, Your Honor, to clear up a few. Let me give you two minutes, because you were way over as well. Thank you, Your Honor. In regards to the point that the plaintiffs could not get an FHA loan, what plaintiffs allege here is they were promised conventional loans, which are private loans by private lenders, or that they were promised a private loan. Not necessarily an FHA loan. And even if you couldn't get an FHA loan, the documentation reflects that Countrywide did, in fact, promise them one. And that makes the Baden switch scheme even more pernicious if they're offering them something that doesn't exist. Can I ask you a question about this discrimination claim? I've never seen this before. We're required to take all statements in the complaint as true, yet the complaint recites a series of hypothetical conversations. Your Honor, those are not relevant to the claim for racial discrimination. Plaintiffs stated a plausible claim for discrimination, that there was an adverse action. They described factual circumstances. They specified the dates. They listed the people involved. They alleged that there was a disparate impact. Where do you get the intent aspect from? Where is that? The intent aspect can be inferred from their allegations that Countrywide was being sued for racial discrimination at the same time they targeted these minority communities. And if you're being sued for discriminating against people at the same time you're targeting them for loans that defendants of Pelley referred in an internal email as poison, I think that is a plausible inference of intent, which, of course, you don't have to plead. I don't understand the inference. The inference is that if you're targeting minority communities with subprime loans, at the same time you are being sued for steering them into worse loans as opposed to similarly situated white Americans, and you're on notice of those allegations, not only in class actions, but there's a U.S. Department of Justice action based on these same steering. At that time or now? There were civil actions at that time, and this is alleged by the plaintiffs in the pleadings on the motion to dismiss, which you can refer to. If countrywide is already getting sued for racial targeting, that tends to show they were engaged in racial targeting? That tends to show that they were aware of the disproportionate racial discriminatory lending practices. It seems like it would support the opposite inference. If they're being sued for racial targeting, it doesn't prove anything at all. You can sue anybody for anything. But the more logical inference would seem to be that they'd be especially careful not to engage in racial targeting if they're being sued for racial targeting. I don't think that is the more plausible inference, given that the allegation is there is a disproportionate impact on racial targeting. Well, people don't like to create evidence that supports the plaintiffs when they're getting sued and are defendants. But the suit itself, the fact that somebody is getting sued for something doesn't prove anything at all. I think what it proves, Your Honor, is that they're on notice of the problem. The Federal Reserve sent them a letter. It may not be a problem. Well, the Federal Reserve sent them a letter containing a statistical analysis of all of their loans. I think maybe you left out some premises here. Sure. It's your argument that you're trying to believe that you've alleged a disparate impact, and, however, what you have to prove is a disparate purpose, ultimately under 1981. Is that much true? That much is true, Your Honor. And, therefore, what you're trying to use this, the lawsuit about is simply to demonstrate their awareness. It doesn't fill all the holes, but it suggests the awareness of the disparate impact. Yes. That's all. Yes, Your Honor. And it's not even proof that they did it because of the disparate impact, but it eliminates the possibility that they didn't know about the disparate impact. Exactly, Your Honor, and that's more than Swerkiewicz requires. What plaintiffs allege is that race was used as a proxy for unsophistication here, and minority borrows were steered into more costly subprime loans. I do just want to mention that in regards to his 3-day point under TILA, that is a misreading of the statute. What it says is that he said that Countrywide didn't provide the plaintiffs with their TILA disclosures at closing. And what that does under the statute is that extends your time to rescind from 3 days to 3 years. And what counsel argued was that nearly 3 years later, they did give them the TILA disclosures, and at that point, they only had to do it. So your point is that they could still sue for the first 3, back to the first date. And it would be different, Your Honor, if they'd given them a new set of TILA disclosures in 2009, if they said, we're sorry, we didn't give you the TILA disclosures, here you are, you have 3 days to rescind. Countrywide didn't do that. What they did is that they gave them the TILA disclosures from 2006, dated on the date of closing, the ones that were never provided to the plaintiffs at the time of closing. Kagan. Thank you very much. Thanks to both of you for trying to illuminate a very complicated case. We appreciate it. And the case of Merritt v. Countrywide Financial is submitted, and we will take a 10-minute break. Thank you.
judges: Smith, Kleinfeld, Berzon